IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ANTHONY L. BILLINGER,                 ) | |
|     Petitioner,                 ) | Civil Action No. 08-321 Erie |
|                                 ) | |
| v.                 ) | |
|                                 ) | District Judge Sean J. McLaughlin |
| KENNETH R. CAMERON, et al.,     ) | Magistrate Judge Susan Paradise Baxter |
|     Respondents.                 ) | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

**I.   RECOMMENDATION**

It is respectfully recommended that the Petition for Writ of Habeas Corpus [Document No. 4] be denied and that a certificate of appealability be denied.

**II.   REPORT**

    **A.   Relevant Background**[1]

In March 2003, Petitioner Anthony L. Billinger was charged with aggravated assault, recklessly endangering another person, and possessing instruments of crime. The charges stemmed from a December 15, 2002, incident during which Petitioner shot and seriously wounded Erie Police Officer William Marucci, who was standing in the parking area of the Metroplex Club, located at 1837 Buffalo Road in the City of Erie.

Bruce Sandmeyer, Esq., represented Petitioner at his trial, which commenced on November 17, 2003. The prosecution introduced evidence to show that early in the morning of December 15, Petitioner positioned himself on the roof of the garage located at 1817 Buffalo Road. He was armed with a Marlin .22 magnum rifle. His intent was to shoot Antonio Barnes, who was standing in the Metroplex's parking area, which was situated approximately 75 yards

---

[1] Respondents have submitted the original state court record ("SCR") and all relevant transcripts. The SCR is indexed and consists of 74 documents. It shall be cited to as "SCR No. __ ."

1

from the garage.[2]  A fight had broken out in the club, and a large crowd of approximately 30-50 people were congregating in the parking area, including Barnes.  Officer Marucci also was there.  He was standing near Barnes, and both men where shot.[3]  (See SCR No. 34, Commonwealth v. Billinger, No. 1324 of 2003, slip op. at 1-10 (C.P. Erie, June 2, 2005) (summarizing evidence introduced at trial)).

      To prove that Petitioner was the shooter, the prosecution introduced evidence that he had purchased the rifle used in the shooting from Michael Gunn.  (Gunn had stolen the rifle and then sold it to Petitioner).[4]  Juan Feliciano was Petitioner's friend and he lived at 1817 Buffalo Road. at the time the shooting occurred.  He testified that two weeks beforehand, Petitioner brought a rifle with a scope and a strap to his home and hid it in a room adjacent to his basement.  (Trial Tr. Day 2 at 20-22).  Feliciano stated that sometime prior to the shooting, he and Petitioner were standing behind his garage and Petitioner said: "this would be a good place to get the mother fucker."  Referring to the nearby parking lot of the Metroplex, Petitioner also stated: "them dudes, they park back here in the back, it would be a good place to get them."  (Id. at 15, 18-19).

      Feliciano further testified that a few hours before the shooting, Petitioner came to his house and told him that he was going into the backyard.  At approximately 1:00 a.m., Feliciano's girlfriend, Cassandra Henry, told Feliciano that she heard a shot while she was in the upstairs bedroom.  Feliciano went outside to his backyard and saw Petitioner on the roof of the garage.  From his vantage point, Feliciano was clearly able to see the Metroplex.  He asked Petitioner if

---

[2] Petitioner suspected that Barnes had robbed his home.  He told his roommate Sam Pope that he was "going to get" Barnes.  Pope testified that after the shooting, Petitioner came home and told him: "I told you I was going to get Dude.  Don't play with me.  I told you I was going to get him."  (Trial Tr. Day 1 at 204).

[3] Lieutenant Lester Fetterman and Detective Patrick Chandley both testified that during their investigation they climbed onto the garage roof and there was a clear line of sight from the garage to the location where Officer Marucci was shot.  (Trial Tr. Day 2 at 91-93, 100).  The police also found two shell casings from the rifle behind the garage.  (Trial Tr. Day 1 at 232; Trial Tr. Day 2 at 90).

[4] Gunn testified that Petitioner was the individual that bought the stolen rifle from him.  During an investigatory photo lineup, he had identified Petitioner as the person to whom he sold the rifle.  (Trial Tr. Day 1 at 79-80).  He also identified Petitioner's residence as the location of the sale of the rifle (Id. at 98).

he was shooting the gun.  Petitioner told him that he was not, and Feliciano re-entered his home.  A short time later, Feliciano heard a shot and people screaming.  He went outside to the front of the house and saw people running up the street.  He went back inside and talked to Petitioner, who was now in the house.  Petitioner said to him: "I got that motherfucker, I told you."  (Id. at 31).

In his defense, Petitioner presented the testimony of a few friends who stated that they were at his home in the early morning hours of December 15 and that Petitioner did not indicate that he had been involved in a shooting.  Antonio Barnes also testified that there was no feud or "bad blood" between he and Petitioner.  He said that although he had heard from other people that Petitioner believed that he had robbed his house, he never heard Petitioner make any such accusation.[5]  (Id. at 174-75, 181).

On the third day of trial (November 19, 2003) the jury announced its verdict.  It found Petitioner guilty of the crimes charged.  The trial court subsequently sentenced him to a total aggregate sentence of 8 years and 3 months to 17 years' incarceration.

Petitioner, through new counsel William J. Hathaway, Esq., appealed.  On December 29, 2005, the Superior Court of Pennsylvania issued a Memorandum affirming his judgment of sentence.  (SCR No. 48, Commonwealth v. Billinger, No. 866 WDA 2005, slip op. (Pa.Super. Dec. 29, 2005)).

Next, on or around July 5, 2006, Petitioner filed a *pro se* motion under Pennsylvania's Post Conviction Relief Act ("PCRA"), 42 PA.CONS.STAT. § 9541 *et seq*.  (SCR No. 51), which he later supplemented (SCR No. 64).  He raised the following three relevant claims.

> Claim 1   Trial Counsel was ineffective for failing to interview or call prospective witness Andre Dunlap to testify for the defense.  Dunlap would have testified that he purchased the Marlin rifle

---

[5] Barnes acknowledged, however, that prior to the shooting he had had a conversation with Petitioner to "clear the air."  (Trial Tr. Day 2 at 181).

|   |   |
|---|---|
|   | from Gunn.[6]  His testimony would have contradicted Gunn's testimony that he had sold the rifle to Petitioner.  In support of this claim, Petitioner submitted an affidavit dated January 11, 2007, in which Dunlap averred that he was "willing and able to testify for the defendant" and that his "testimony was material and relevant in the defendant's case."  (See Dunlap Aff., attached to SCR No. 64). |
| Claim 2 | Trial Counsel was ineffective for failing to investigate and challenge the prosecution's theory that, from Petitioner's vantage point atop the garage at 1817 Buffalo Road, he would have had a clear line of sight into the Metroplex's parking area.  According to Petitioner, if counsel had reviewed diagrams of the crime scene prepared by the Erie Police (see attachments to SCR No. 64) and retained a ballistics expert, he would have discovered that a Jeep was parked on a street corner and its positioning obstructed the line of fire, thereby discounting the prosecution's theory of the case. |
| Claim 3 | Trial counsel was ineffective for failing to object to testimony that Gunn had identified Petitioner in a photographic lineup, because the array was not produced at trial or otherwise made part of the record. |

The PCRA Court appointed Nicole Denise Sloane, Esq., with the Public Defender's Office, to represent Petitioner.  An evidentiary hearing was held on October 29, 2007.  Sandmeyer (trial counsel) testified for the Commonwealth.  Ryan Gallenstein, Alicia Goodwine, and Anthony Billinger testified to support Petitioner's case.  Petitioner had subpoenaed Dunlap, but he did not appear.

On November 20, 2007, the PCRA Court issued an Opinion and Order denying Petitioner's claims on the merits.  (SCR No. 68, Commonwealth v. Billinger, No. 1324 of 2003, slip op. (C.P. Erie, Nov. 20, 2007)).  Petitioner, through Sloane, appealed.  On July 25, 2007, the Superior Court issued a Memorandum affirming the PCRA Court's decision.  It rejected Petitioner's ineffective assistance claims on the merits.  (SCR No. 74, Commonwealth v. Billinger, No. 2150 WDA 2007, slip op. (Pa.Super. July 25, 2007)).

Next, Petitioner filed with this Court his *pro se* Petition For Writ Of Habeas Corpus pursuant to 28 U.S.C. § 2254 [Document No. 4].  He raises the same three claims discussed

---

[6] At least in part, Petitioner based his assumption as to what Dunlap would have testified to if called at trial on excerpts from a police reporting indicating that Gunn initially had told police that he had sold the rifle to a person named "Dre."  Petitioner's nickname is "Fleego," not "Dre."  According to Petitioner, Dunlap's nickname is "Dre."

above.  Respondents have filed their Answer [Document No. 11] and all relevant state court records.

### B.   Discussion

### Standard Of Review

Because the Superior Court rejected Petitioner's claims on the merits, this Court's review of those claims is circumscribed by the standard enacted by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which is codified at 28 U.S.C. § 2254(d).  AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 693 (2002).  It provides, in relevant part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]

28 U.S.C. § 2254(d)(1).  See also Williams v. Taylor, 529 U.S. 362, 405-06 (2000); Lambert v. Blackwell, 387 F.3d 210, 234 (3d Cir. 2004).

The "clearly established Federal law," 28 U.S.C. § 2254(d)(1), in which to analyze claims of ineffective assistance of counsel is set forth in Strickland v. Washington, 466 U.S. 668 (1984). Under Strickland, Petitioner must show that Sandmeyer's "representation fell below an objective standard of reasonableness."  466 U.S. at 688; see also Williams, 529 U.S. at 390-91.  "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Thomas v. Varner, 428 F.3d 491, 499 (3d Cir. 2005) (quoting Strickland, 466 U.S. at 689).  "However, [b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of professional assistance; that is, the defendant must

5

overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Id. (quoting Strickland, 466 U.S. at 689).  "[I]t is only the rare claim of ineffective assistance of counsel that should succeed under the properly deferential standard to be applied in scrutinizing counsel's performance." United States v. Kauffman, 109 F.3d 186, 190 (3d Cir. 1997).

      Petitioner also must show under Strickland that he was prejudiced by Sandmeyer's alleged deficient performance.  This requires him to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694.

      The Superior Court applied the correct legal standard when it evaluated Petitioner's ineffective assistance of counsel claims.  (See SCR No. 74, Billinger, No. 2150 WDA 2007, slip op. at 3-4).  See also Commonwealth v. Kimball, 724 A.2d 326 (Pa. 1999) (the legal standard for evaluating ineffective assistance claims in a PCRA proceeding is the same as the federal Strickland standard).  Therefore, the Superior Court's adjudication of Petitioner's claims was not "contrary to" Strickland.  Werts v. Vaughn, 228 F.3d 178, 202-04 (3d Cir. 2000) ("[A] state court decision that applied the Pennsylvania [ineffective assistance of counsel] test did not apply a rule of law that contradicted Strickland and thus was not 'contrary to' established Supreme Court precedent.").  This Court, then, may grant federal habeas relief only if Petitioner shows that the Superior Court's adjudication of one of his claims was an "unreasonable application" of Strickland.  To prevail under this standard of review, Petitioner must demonstrate that the Superior Court's adjudication "cannot reasonably be justified under existing Supreme Court precedent." Hackett v. Price, 381 F.3d 281, 287 (3d Cir. 2004); Knowles v. Mirzayance, — U.S. — ,129 S.Ct. 1411, 1420 (2009) (quoting Schriro v. Landrigan, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold")); Waddington v. Sarausad, — U.S. — , 129 S.Ct. 823, 831 (2009) (where it is the state court's application of governing federal law that is challenged, "the state court's decision

6

must be shown to be not only erroneous, but objectively unreasonable.") (internal citations and quotations omitted).  This standard adds another hurdle in addition to the already heavy burden Petitioner faces under Strickland.  Knowles, 129 S.Ct. at 1420 (noting "the doubly deferential judicial review that applies to a Strickland claim evaluated under the § 2254(d)(1) standard.").

For the reasons set forth below, Petitioner has not shown that the Superior Court's adjudication of any his claims was an unreasonable application of Strickland.

### Claim 1 – The Failure To Interview and Call Andre Dunlap As a Defense Witness

In his first claim, Petitioner faults Sandmeyer for failing to interview Andre Dunlap and present him as a defense witness.  According to Petitioner, Dunlap's nickname was "Dre" and it was he who had purchased from Gunn the rifle used in the shooting.  Petitioner asserts that if Sandmeyer had interviewed Dunlap,[7] he would have realized that Dunlap matched the description Gunn initially had provided to the police when he described the individual who had bought the rifle from him.  Had counsel investigated and presented Dunlap as a defense witness, Petitioner argues, Sandmeyer could have impeached Gunn's trial testimony.

Claim 1 suffers from several shortcomings and the Superior Court's rejection of it (SCR No. 74, Billinger, No. 2150 WDA 2007, slip op. at 3-6) easily withstands federal habeas review.  First, Petitioner has failed to support the factual assertions that he makes in support of it.  He claims Dunlap could have provided exculpatory testimony at trial, but when it came time for him to introduce evidence to substantiate this contention, he failed to so.  Since Dunlap did not appear at the PCRA hearing, Petitioner has not shown what he would have stated if Sandmeyer had called him as a defense witness.  For this reason alone, Claim 1 fails.

Second, Petitioner has not shown that he was prejudiced by Sandmeyer's decision not to interview Dunlap or pursue the defense that it was he, and not Petitioner, who had bought the rifle from Gunn.  The fact is, regardless of who purchased the stolen rifle from Gunn, the

---

[7] Dunlap was an inmate in the state corrections system at the time of Petitioner's trial.  He had been released from custody by the time of the PCRA hearing.

prosecution introduced plenty of evidence to show that Petitioner was the individual who was using it to shoot at the crowd of people standing in the Metroplex parking area in the early morning hours of December 15, 2002.

Third, Sandmeyer articulated an objectively reasonable basis as to why he opted against interviewing Dunlap and presenting him as a defense witness.  At the PCRA hearing, Sandmeyer testified that he was aware that Gunn initially had told the police that he had sold the rifle to a man that went by Dunlap's nickname.  But, Sandmeyer explained, the discovery the defense received showed that the police had interviewed Dunlap as part of its investigation and he had "denied outright receiving any rifle or in any way being involved in the incident at the Metroplex." (PCRA Hr'g Tr. at 49; see also id. at 61).  It was objectively reasonable for Sandmeyer to believe that Dunlap would not admit anything different to him, especially since such an admission possibly could implicate him in the crimes.

Fourth, and finally, Sandmeyer also reasonably believed that he would not be able to impeach Gunn's identification with testimony from Dunlap.  He explained that he had interviewed Gunn before the preliminary hearing and Gunn "was very confident" in his identification of Petitioner.  (Id. at 49-50; see also id. at 61-62).  Because of Gunn's confidence, and Dunlap's statement that he was not involved, Sandmeyer opted not to conduct further investigation.  It is also worth noting that Petitioner did not indicate to Sandmeyer that he should pursue an investigation into whether Dunlap had actually been the purchaser of the gun.  (Id. at 48-49).

### Claim 2–Failure To Adequately Investigate and Present Evidence Pertaining To the Impossibility Of the Commonwealth's Theory Pertaining To the Line Of Sight

In his next claim, Petitioner contends that Sandmeyer was ineffective because he failed to investigate the Commonwealth's theory that Petitioner was able to shoot into the Metroplex parking area from atop the garage roof.  He asserts that Sandmeyer should have retained a ballistics expert to show that the Commonwealth's theory was not possible.  Petitioner also contends that if Sandmeyer had reviewed police diagrams of the crime scenes, he would have

8

learned that a Jeep was parked in a manner that obstructed the line of sight from the top of the garage to the location where the victims were shot.

Petitioner did not present the testimony of a ballistic expert at the PCRA hearing to support his contention that the Commonwealth's line-of-sight theory was faulty.  He therefore has failed to establish how such an expert could have assisted the defense, and consequently has failed to show that Sandmeyer was ineffective for failing to retain such an expert.

Similarly, Petitioner has not shown that Sandmeyer's investigation generally into the matter was objectively unreasonable.  Sandmeyer testified that he visited the crime scenes on two occasions and that afterwards there was no doubt in his mind "that the garage roof was in line of sight to where the alleged shooting would have taken place."  (PCRA Hr'g Tr. at 54).  He explained that he has been in the military for 20 years; is "very familiar with a multiple variety of firearms"; and, that his background aided him in evaluating the crime scenes.  (Id. at 55).  He noted, however, that even a layperson could "see that the [garage] roof was in an unexposed firing position.  It was [an] open shot to the front corner of the Metroplex."  (Id.)  Responding to Petitioner's contention that the Jeep would have obstructed the line of sight, Sandmeyer explained it would not have since the garage was in an elevated position, and therefore was higher than the Jeep.  (Id. at 66).

Sandmeyer also explained that after he visited the crime scene, he determined that the best course for the defense to take was to introduce evidence to show that Petitioner would have been too intoxicated to do what the prosecution was asserting he had done:  successfully targeting Barnes from 75 yards away while Barnes was milling around a shifting crowd of 30-50 people.  (See id. at 56 (Sandmeyer:  "We were able to show that [Petitioner] had been drunk, ... and that it would have been difficult for anybody to have made that shot, especially in an intoxicated manner.  We brought out through several witnesses that training is necessary to take any sort of long-distance type of shot and be accurate.").  That the defense ultimately was not successful was not the result of ineffectiveness on Sandmeyer's part.

Additionally, Petitioner has not shown that there is a reasonable probability that the outcome of his trial would have been different but for Sandmeyer's handling of the line-of-sight

9

issue. As set forth above, the Commonwealth introduced evidence that Petitioner planned to shoot Barnes from atop Feliciano's garage, had kept a rifle at Feliciano's house for that purpose, had carried out his plan on the morning of December 15, 2002, and had shot Officer Marucci in the process. Accordingly, he was not prejudiced by Sandmeyer's alleged ineffectiveness and the Superior Court's rejection of this claim (SCR No. 74, Billinger, No. 2150 WDA 2007, slip op. at 6-8) will not be disturbed under Strickland and AEDPA.

### Claim 3–Failure To Object To the Reference Made About Gunn's Identification Of Petitioner During a Photographic Lineup

In his final claim, Petitioner contends that Sandmeyer was ineffective because he did not object when Gunn testified that he had selected him from a photographic lineup when asked by investigators to identify the person to whom he had sold the stolen rifle. Petitioner argues that Sandmeyer should have objected on the basis that the photo array was not produced during discovery or introduced as evidence at the trial.

In rejecting this claim, the Superior Court determined that there was no basis for an objection and that, in any event, Petitioner was not prejudiced because Gunn knew Petitioner well and had identified him in court. (SCR No. 74, Billinger, No. 2150 WDA 2007, slip op. at 7-8; see also PCRA Hr'g Tr. at 52 (where Sandmeyer explained that he did not object to the reference to the photo lineup identification because "[Gunn] also made an identification in his testimony that he had been around [Petitioner] 20 or 25 times at his house. It did not seem like an objectionable issue.")). Its adjudication of Claim 3 was not "objectively unreasonable" and no relief is warranted under Strickland and AEDPA. Petitioner also was not prejudiced because, as set forth above, the Commonwealth introduced compelling evidence that was independent of Gunn's testimony to show that Petitioner was the individual who was shooting the rifle into the crowd of people standing in the Metroplex parking area on December 15, 2002.

### C.     Certificate of Appealability

28 U.S.C. § 2253 governs the issuance of a certificate of appealability for appellate

review of a district court's disposition of a habeas petition. It provides that "[a] certificate of appealability may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right." Where the federal district court has rejected a constitutional claim on its merits, "the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong[.]" Szuchon v. Lehman, 273 F.3d 299, 312 (3d Cir. 2001) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)). Applying this standard here, jurists of reason would not find it debatable whether Petitioner's claims are without merit. Accordingly, a certificate of appealability should be denied.

### III.  CONCLUSION

For the foregoing reasons, it is respectfully recommended that the Petition for Writ of Habeas Corpus be denied and that a certificate of appealability be denied.

Pursuant to the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.D.2 of the Local Civil Rules, Petitioner is allowed to file objections in accordance with the schedule established in the docket entry reflecting the filing of this Report and Recommendation. Failure to file timely objections may constitute a waiver of any appellate rights. See Nara v. Frank, 488 F.3d 187 (3d Cir. 2007).

/s/ Susan Paradise Baxter
SUSAN PARADISE BAXTER
United States Magistrate Judge

Dated:  May 12, 2010

cc:    The Honorable Sean J. McLaughlin
       United States District Judge